**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Case No: 19-cr-00429-WJM

UNITED STATES OF AMERICA,

       Plaintiff,

v.

1. EDGAR MARCELLO RAMOS-TELLEZ, and
**2. JOHNNY JOE LOPEZ**,

       Defendants.

---

**DEFENDANT JOHNNY JOE LOPEZ'S MOTION FOR EMERGENCY RELEASE**

---

       Defendant Johnny Joe Lopez, by and through counsel, Lisa A. Polansky, Attorney at Law, respectfully moves this Honorable Court for his immediate release from detention, and in support of this motion submits the following:

       Mr. Lopez is currently detained at the GEO detention facility in Aurora, Colorado and he is among the group of people the Centers for Disease Control and Prevention ("CDC") has categorized as most-at-risk for contracting COVID-19, a dangerous illness spreading rapidly through the Denver, Colorado metropolitan area, and across the world.

Basic Factual and Procedural Background

1. Mr. Lopez was arrested on September 26, 2019 and charged with conspiracy to violate 21 U.S. 846(a)(1)(A)(ii) and attempt to violate 21 U.S.C. §§ 841 (a)(1) and (b)(1)(A)(ii) by complaint, and subsequently superseding indictment, based solely

upon a single drug transaction.

2. On October 2, 2019, after a contested detention hearing, Magistrate Judge N. Reid Neureiter ordered Mr. Lopez detained.

3. On that same date, the Pretrial Services report herein recommended a $5,000 unsecured bond. It was the opinion of Pretrial Services that there was a combination of conditions that would reasonably assure Mr. Lopez's appearance at future court dates and the safety of the community: for example, drug treatment and testing.

4. The decision was subsequently reviewed by this Honorable Court and reconsideration was denied at that time, so Mr. Lopez has remained detained.[1]

5. There is no evidence to suggest that Mr. Lopez will flee the jurisdiction if he were released pending trial—as this Court has found, "[t]he risk of flight is minimal given Lopez's strong incentive to stay close to home on account of his need for medical treatment and the support he gives his wife." (ECF Doc.# 57, pp. 6-7).  Indeed, Mr. Lopez is a citizen of the United States and a Colorado resident of more than ten years.  He has extensive ties to the community, having lived in the same home in Denver for seven years. He has been married for the last four years. He also suffers from psoriatic arthritis and chronic pain, which also weigh against any possible argument that Mr. Lopez should be considered a flight risk.

6. As this Court has also noted, Mr. Lopez is tied to the Colorado community by his

---

[1] Court's Order on the Motion for Reconsideration of Magistrate Judge's Detention Order (ECF Doc. # 57) noted that this was a "close case", at p. 6, and therein, the Court expressed concerns with Mr. Lopez's disclosure that his medical needs were not being met in detention. The Court noted that "[s]hould [lack of appropriate medical care] continue, Lopez is free to petition the Court for relief appropriate to the circumstances," *Id.* at p. 7, and Mr. Lopez accordingly does so in the instant motion.

wife, Jonnetta Lopez, who suffers from health challenges of her own and relies on Mr. Lopez's support.

7. Further, Mr. Lopez has a strong work history and owns his own small company, JL Construction.

8. Although Mr. Lopez has some criminal history, in those matters he has consistently returned to court on bond.  For example, in 2001, Mr. Lopez posted a $10,000 bond, and later returned to court for a sentencing wherein Mr. Lopez was aware that it was stipulated that he would be sentenced to four years in the Department of Corrections.

9. It is true that there exists a presumption, due to the nature of the charges filed against Mr. Lopez, that he is a risk to the community. In its Order denying the Motion for Reconsideration of Magistrate Judge's Detention Order, this Court previously held that "Lopez has not met the burden of production placed on him due to the presumption of a threat to community safety." (ECF Doc.# 57, p. 7)

10. Mr. Lopez asserts that there is no any concrete evidence that Mr. Lopez poses an identified and articulable danger to others if he were to be released on bond beyond the presumption that attaches to his charges, of which is he has not been found guilty, and is, in fact, presume innocent.  All factors other than the nature of the case—especially in light of the special circumstances present due to the pandemic—such as his age, health, the non-violent allegations in the case, indicate that Mr. Lopez does not pose a risk of danger to the community if released.

11. The Bail Reform Act provides for the "temporary release" of a person in pretrial custody "to the extent that the judicial officer determines such release to be

necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i).

12. Another compelling reason, as the Bail Reform Act anticipates, is present: the risk to 63-year-old Mr. Lopez, were he to remain incarcerated pending trial is extremely heightened.  This is not only because of his age, but specifically because he suffers from psoriatic arthritis for which he is currently receiving treatment, resulting in a compromised immune system.  In order to treat his psoriatic arthritis, Mr. Lopez receives injections of Remicade every six weeks, and Remicade is an immunosuppressant.[2]

13. Accordingly, permitting Mr. Lopez to remain incarcerated is extremely dangerous and particularly cruel—and may in fact constitute deliberate indifference and failure to accommodate his elevated risk of mortality due to his age and immunosuppressed condition amid the COVID-19 pandemic.

14. The conditions at the GEO detention facility as described in detail below, necessitate Mr. Lopez's temporary release on bail, at least until this pandemic has subsided.

15. During the period of release, Mr. Lopez will reside at his home in Denver, Colorado, with his wife Jonnetta Lopez under whatever conditions the court sees fit to reasonably ensure his appearance in court.

Changed Circumstances: COVID-19 Outbreak

16. As of March 19, 2020, the new strain of coronavirus which causes COVID-19, has

---

[2] https://www.accessdata.fda.gov/drugsatfda_docs/label/2009/103772s5234lbl.pdf

infected over 242,191 people and has caused at least 9,843 deaths worldwide.[3]

17. On March 11, 2020, the World Health Organization officially classified COVID-19 as a pandemic.[4]

18. In the United States, there have been 10,750 confirmed cases of COVID-19 and over 150 deaths.[5]

19. Colorado Governor Jared Polis declared a State of Emergency on March 10, 2020. Additional protective measures have been taken including the closure of all schools until April 17, 2020, the closure of Colorado ski resorts for no less than three weeks and in some cases, the remainder of the season, and the closure of all restaurants and bars for at least 30 days.

20. As of March 19, 2020, there are 221 positive cases of COVID-19 in Colorado and 3 reported deaths.[6]

21. The CDC has issued guidance that individuals at higher risk of contracting COVID-19—specifically, adults over 60 years old and people with chronic medical conditions such as the immunocompromised—take immediate preventative actions, including avoiding crowded areas and remaining confined to their homes as much as possible.[7] Confirmed cases in Denver, Colorado demonstrate that the pandemic is spreading here, indicating that the community must take every

---

[3] https://www.gisaid.org/epiflu-applications/global-cases-covid-19/
[4] *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (March 11, 2020) *at* https://bit.ly/2W8dwpS.
[5] https://www.npr.org/sections/coronavirus-live-updates/2020/03/19/818235770/confirmed-coronavirus-cases-in-the-u-s-near-10-000
[6] https://www.denverpost.com/2020/03/19/coronavirus-third-death-el-paso-county/
[7] *People at Risk for Serious Illness from COVID-19*, CDC (March 12, 2020) *at* https://bit.ly/2vgUt1P.

necessary action to protect vulnerable populations and the community at large.

Conditions of Confinement and the Spread of Coronavirus

22. Conditions of pretrial confinement create the ideal environment for the transmission of contagious disease.[8]   Generally, inmates cycle in and out of detention facilities from all over the country, but specifically, in the case of the GEO detention facility, detainees hail from all over the world, as that facility primarily houses people who are currently in immigration proceedings.   The people who work in prison facilities, including the correctional officers and care and service providers, leave and return daily, generally without screening.

23. Incarcerated people have poorer health than the general population, and even at the best of times, their medical care is limited.[9]   Many people who are incarcerated also have chronic conditions, such as diabetes or HIV, which renders them vulnerable to severe forms of COVID-19.

24. According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations" and "may also be less able to participate in proactive measures to keep themselves safe"; "infection control is challenging in these settings."[10]

25. In the United States, steps are already being taken in some jurisdictions to

---

[8] Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, *at* https://doi.org/10.1086/521910.
[9] Laura M. Maruschak et al. (2015). Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12. NCJ 248491. Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, *at* https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf
[10] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), *at* https://bit.ly/2W9V6oS.

facilitate the release of elderly and sick prisoners and to reduce jail populations by discouraging the arrest of and refusing the admission of individuals arrested on non-violent misdemeanor charges.

Specific Cities' and States' Reduction Strategies and Implementation

26.  Cities across the United States are already taking significant action to reduce their detainee populations and prevent the spread of COVID-19.

27. In Los Angeles County, inmates with 30 days or fewer to be served remaining on their sentences have been released. There, the sheriff has asked police departments to limit arrests to only dangerous suspects, thereby decreasing new entries to jails.  Defendants awaiting trial who have bail set at $50,000 or less are being cited and released. Since February 28, the Los Angeles County Sheriff's Department has reduced the jail population by more than 600 people.  Countywide, average daily arrests have dropped from 300 to 60.[11]

28. In Brooklyn, New York, District Attorney Eric Gonzalez said his office would "immediately decline to prosecute low-level offenses that don't jeopardize public safety," and is also asking defenders to alert his office to clients in pretrial detention who are vulnerable to infection that he should consider releasing during the outbreak.[12]

---

[11] https://www.latimes.com/california/story/2020-03-16/la-jail-population-arrests-down-amid-Coronavirus
[12] https://twitter.com/BrooklynDA/status/1239906541182111744?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1239906541182111744&ref_url=https%3A%2F%2Fthehill.com%2Fhomenews%2Fstate-watch%2F487987-brooklyn-da-says-his-office-wont-prosecute-some-low-level-offenses-amid and https://www.msn.com/en-us/news/politics/brooklyn-da-says-his-office-wont-prosecute-some-low-level-offenses-amid-Coronavirus-outbreak/ar-BB11jBGl

29. In New York City, the Board of Correction called for the immediate release of all inmates who are at high-risk for COVID-19.  Mayor Bill de Blasio plans to release "vulnerable" inmates from city jails to prevent the spread of the Coronavirus pandemic into local lockups, he said yesterday (Wednesday, March 18).  "In the next 48 hours, we will identify any inmates who need to be brought out because of either their own health conditions — if they have any pre-existing conditions, etc. — or because the charges were minor and we think it's appropriate to bring them out in this context," de Blasio said on WCBS radio Wednesday evening.[13]  Ross MacDonald, the chief medical officer for Correctional Health Services in New York, has called on prosecutors and judges to enable prisoners to be released from the state's jails in response to the novel coronavirus outbreak.[14]

30. In Cleveland, Ohio, Cuyahoga County's judges, sheriff and prosecutor have agreed to hold mass plea hearings to get as many people as possible out of the county's jail to lessen the impact of a potential outbreak of the novel coronavirus. The plan specifically calls for assistant prosecutors, defense attorneys, defendants and judges to work toward plea bargains to dispose of as many cases as possible. Cuyahoga Administrative Judge Brendan Sheehan has asked the judges to prioritize cases where the defendant is currently held in jail and is charged with non-violent and low-level felonies, in the service of their goal of releasing 300 people.[15]

---

[13]https://www.wsj.com/articles/new-york-city-to-release-some-inmates-to-stop-Coronavirus-spread-11584626666.
[14] https://twitter.com/RossMacDonaldMD/status/1240455802193883137
[15]https://www.msn.com/en-us/news/crime/cuyahoga-county-officials-will-hold-mass-plea-hearings-to-reduce-jail-population-over-Coronavirus-concerns/ar-BB116nGJ

Case 1:19-cr-00429-WJM   Document 85   Filed 03/19/20   USDC Colorado   Page 9 of 16

31. Baltimore City's State's Attorney Marilyn Mosby ordered her staff Wednesday to dismiss pending criminal charges against anyone arrested for possessing drugs including heroin, attempted distribution of any drug, prostitution, trespassing, minor traffic offenses, open container violations and urinating in public.  She also asked Maryland Governor Larry Hogan to free any inmates over the age of 60 in state prisons, as well as any inmates who have already been approved for parole or who are scheduled to finish their sentences in the next year.[16]

32. Prosecutors in Prince George County, Maryland have announced that they are reviewing cases one-by-one and plan to release at least 40 people held on nonviolent offenses.[17]

33. In Ohio, a court order will authorize Hamilton County Sheriff Jim Neil, at his discretion, to release low-risk, nonviolent inmates who are not charged with sex crimes from the jail.[18]

34. In Travis County, Texas, judges have been releasing inmates to reduce the chance of the new coronavirus spreading in the county jail and harming people with pre-existing health conditions.[19]

---

[16]https://www.baltimoresun.com/Coronavirus/bs-md-ci-cr-mosby-prisoner-release-20200318-u7knneb6o5gqvnqmtpejftavia-story.html and https://thehill.com/policy/healthcare/488304-baltimore-to-stop-prosecuting-some-non-violent-charges-amid-Coronavirus

[17]https://www.wusa9.com/article/news/health/Coronavirus/Coronavirus-jails-prince-georges-county-corrections-center/65-9e10103f-20a5-4583-924a-2a23ad99629f

[18]https://www.cincinnati.com/story/news/crime-and-courts/2020/03/16/Coronavirus-hamilton-county-sheriff-release-low-risk-inmates/5062700002/

[19]https://www.statesman.com/news/20200316/travis-county-judges-releasing-inmates-to-limit-Coronavirus-spread?fbclid=IwAR3VKawwn3bwSLSO9jXBxXNRuaWd1DRLsCBFc-ZkPN1INWW8xnzLPvZYNO4

9

35. San Francisco County District Attorney Chesa Boudin has directed prosecutors not to oppose motions to release detainees facing misdemeanor charges or drug-related felony charges also directed his staff to "strongly consider" credit for time served in plea deals so that more people can be released.[20]

Specific Examples of Pandemic Responses in Other Countries

36. Internationally, there are examples of how releasing individuals who are unnecessarily incarcerated can be pivotal in combatting the coronavirus, such as in Iran, and examples of how failing to do can have devastating effects, as evidenced in China, in Sao Paulo, Brazil and in Italy.

37. Iranian authorities have released more than 85,000 prisoners on temporary leave. Judiciary spokesman Gholamhossein Esmaili told reporters the inmates were allowed out of prison after testing negative for COVID-19 and posting bail. Iran's Supreme Leader Ayatollah Ali Khamenei will pardon 10,000 prisoners including political detainees tomorrow (Friday, March 19). A large number of prisoners who have been temporarily freed will not need to return to jail after this pardon. Asked whether political prisoners were among those freed, in a briefing aired by state television, Esmaili responded: "Yes, about 50% of the security-related prisoners have been released." As of January 2020, Iran reported that 189,500 people were in prison. There are also precautionary measures being taken in Iranian jails to mitigate the outbreak.[21]

---

[20] https://theappeal.org/Coronavirus-san-francisco-reduce-jail-population/
[21] https://abcnews.go.com/Politics/american-furloughed-iranian-prison-coronavirus-raises-concerns-detained/story?id=69687201; https://www.aljazeera.com/news/2020/03/iran-khamenei-pardon-10000-prisoners-nowruz-200319010923876.html; https://www.reuters.com/article/us-health-coronavirus-

38. Coronavirus cases exploded in Chinese prisons; China reported over 500 cases in prisons four weeks ago.[22]

39. In Sao Paulo, Brazil, hundreds of people who were incarcerated escaped from four prisons after they staged a rebellion amid the coronavirus pandemic and restrictions.  Several prisons are reporting rioting and rebellions.[23]

40. In Italy, at least six inmates died and 50 more escaped amid prison riots in 27 detention facilities over visitation, furlough, and parole restrictions imposed for the epidemic.[24]

Specific Conditions at the GEO Detention Facility as Pertain to Mr. Lopez

41.  Recently in this case, the Government has provided the defense with a significant amount of additional discovery per the Court's Order [including transcripts with translations of conversations and meetings pertaining to the alleged conspiracy].

---

iran-prisoners/iran-temporarily-frees-85000-from-jail-including-political-prisoners-amid-coronavirus-idUSKBN21410M; https://www.reuters.com/article/us-health-coronavirus-iran-prisoners/iran-temporarily-frees-85000-from-jail-including-political-prisoners-amid-coronavirus-idUSKBN21410M; https://abcnews.go.com/Politics/american-furloughed-iranian-prison-coronavirus-raises-concerns-detained/story?id=69687201; https://www.bbc.com/news/world-middle-east-51723398].

[22] https://www.cnbc.com/2020/02/21/coronavirus-latest-updates-chinas-hubei-reports-115-additional-deaths.html; https://www.theguardian.com/world/live/2020/feb/21/coronavirus-live-updates-china-wuhan-hubei-south-korea-cases-infections-death-toll-outbreak-diamond-princess-latest-news

[23] https://www.theguardian.com/world/2020/mar/17/come-back-monday-ok-hundreds-of-prisoners-escape-in-brazil-amid-covid-19-anger; https://www.newsweek.com/hundreds-brazilian-prisoners-escape-after-prison-riot-over-cancelled-easter-exits-due-coronavirus-1492649; https://www.independent.co.uk/news/world/americas/coronavirus-brazil-prison-lockdown-inmates-escape-latest-a9405651.html

[24] https://www.thedailybeast.com/six-inmates-dead-scores-escape-as-prisoners-riot-across-italy-after-visitor-restrictions-over-coronavirus; https://www.bbc.com/news/world-europe-51805727; https://www.aljazeera.com/news/2020/03/inmates-die-prison-riots-coronavirus-rules-italy-200309125813658.html

42. At present, legal visits at the GEO detention facility have been suspended for 30 days.[25]  Without legal visitation, it is not possible for Mr. Lopez to review discovery with his counsel and assist in his defense.

43. The right of access to counsel is of utmost importance for pretrial detainees.  The Supreme Court has stated that depriving a person of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself. *Maine v. Moulton,* 474 U.S. 159, 180, (1985).

44. The restrictions imposed on visitation at the GEO Detention facility where Mr. Lopez is housed have the effect of depriving Mr. Lopez of the access to counsel needed to meaningfully assist in preparation of his defense.

45. In order to effectively prepare for trial, Mr. Lopez needs to not only have counsel appointed to represent him, but to also have access to his appointed counsel so that he may assist in the preparation his defense.  Mr. Lopez's case is proceeding to trial, his co-defendant is postured to testify against him, and pretrial litigation is underway. In order to effectively participate in his own defense, Mr. Lopez must have access to counsel and in light of current Bureau of Prison regulations restricting legal visitation, that can only be achieved by his release from custody.

The Bail Reform Act Requires Mr. Lopez's Release

46. A "judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person to the extent that the judicial officer determines such release to be necessary for the preparation of the person's defense or for another compelling reason." 18

---

[25] https://www.bop.gov/resources/news/20200313_covid-19.jsp

U.S.C. § 3142(i).

47. The circumstances that existed when Mr. Lopez was initially ordered detained, and when this Court upheld that detention order, have now changed. There is a global pandemic that poses a direct risk that is far greater if Mr. Lopez continues to be detained during this public health crisis.

48. Mr. Lopez is uncommonly vulnerable as he an immunocompromised 63-year-old. He is both elderly and has pre-existing conditions, two of the factors that place an individual at the highest risk of contracting COVID-19.

49. Liberty is the norm and "detention prior to trial or without trials is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). One charged with a crime is, after all, presumed innocent. *Stack v. Boyle*, 342 U.S. 1, 4 (1951). A single individual unnecessarily detained before trial is one individual too many, and the increasing use of the practice places tremendous wear on our constitutional system. *United States v. Montalvo-Murillo*, 495 U.S. 711, 723–24 (1990) (Stevens, J., dissenting, joined by Brennan and Marshall, JJ.).

50. Courts have long recognized that there is no greater necessity than keeping a defendant alive, irrespective of the charge they face. As Judge Weinstein held, "We do not punish those who have not been proven guilty. When we do punish, we do not act cruelly. Continued incarceration of this terminally ill defendant threatens both of these fundamental characteristics of our democracy." *United States v. Scarpa*, 815 F.Supp.88 (E.D.N.Y. 1993) (pretrial defendant with AIDS facing murder charges released on bail because of the "unacceptably high risk of infection and death on a daily basis inside the MCC").

51. Continuing to keep Mr. Lopez incarcerated is tantamount to cruelly punishing somebody who has not even been found guilty.  COVID-19 is a global pandemic. Those at the greatest are the elderly and those with pre-existing conditions such as the immunocompromised. Mr. Lopez's psoriatic arthritis requires him to take immunosuppressants that render his body less able to fight the type of respiratory infection that results from COVID-19 than other detainees.  In short, his continued detention poses an unacceptable risk that he will lose his life.

52. This Court should consider the "total harm and benefits to prisoner and society" that continued pretrial imprisonment of Mr. Lopez will yield, relative to the heightened health risks posed to Mr. Lopez during this rapidly encroaching pandemic.  *See Davis v. Ayala*, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J., concurring) (calling for heightened judicial scrutiny of the projected impact of jail and prison conditions on a defendant).

<u>Conditions of Release Are Available that Allow Mr. Lopez to be Treated Humanely While Also Ameliorating Any Danger to the Community</u>

53. From Mr. Lopez's perspective, his life—not only his liberty—is at stake, creating a powerful incentive to abide by any conditions of release the Court may impose.

54. In this matter, Magistrate Judge Neureiter was initially concerned that Mr. Lopez was a flight risk because of the significant amount of money involved in the alleged transaction.

55. However, regardless of the origin of that amount of money, circumstances have changed and such concerns regarding travel are no longer warranted amid the COVID-19 outbreak.

56. Additionally, the Court would be able to rectify these concerns and ensure Mr. Lopez's appearance by ordering specific conditions to ensure his appearance, to include, but not limited to, GPS monitoring, as a condition of his release.

57. Leaving Mr. Lopez in custody is unnecessary at this point and is frankly cruel, given the rapidly developing pandemic, his ill health, and the COVID-19 exposure in Mr. Lopez's facility.

58. For these reasons, this Court should immediately release Mr. Lopez with appropriate conditions.

DATED: March 19, 2020.                     Respectfully Submitted,

s/Lisa A. Polansky
Lisa A. Polansky, #31539
Polansky Law Firm
4999 Pearl East Circle, Suite 201
Boulder, Colorado 80301
(303) 415-2583
lisa@polanskylawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 19, 2020, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to all other counsel of record.


s/Lisa A. Polansky